IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| WILLIAM ANTHONY COLÓN, <br><br> Plaintiff <br><br> v. <br><br> RUBÉN BLADES, <br> ROBERTO MORGALO, <br> MARTÍNEZ, MORGALO & <br> ASSOCIATES, <br><br> Defendants | |
| RUBÉN BLADES, <br><br> Cross-Plaintiff <br><br> v. <br><br> ROBERTO MORGALO, in his personal <br> capacity and as owner and member <br> of MARTÍNEZ, MORGALO & <br> ASSOCIATES, LLC; MARTÍNEZ, <br> MORGALO & ASSOCIATES, LLC., <br><br> Cross-Defendants | CIVIL 07-1380 (JA) |

OPINION AND ORDER

This matter is before the court on motion for default judgment filed on March 1, 2010 by cross-plaintiff Rubén Blades against cross-defendant Martínez, Morgalo & Associates, Inc., (hereinafter "M.M.A."). (Docket No. 133.)  A hearing on damages was held on April 5, 2010.  (Docket No. 163.)

CIVIL 07-1380 (JA)                        2

I.  FACTUAL AND PROCEDURAL BACKGROUND

In 2002, Roberto Morgalo, Arturo Martínez, and their company M.M.A. entered into negotiations to book a concert featuring a musical performance between William Anthony Colón and Mr. Blades to commemorate the album "Siembra" originally released in 1978.  (Docket No. 56, at 4, ¶ 12.)

On or about January, 2003, Mr. Morgalo's company acting as an agent on behalf of Mr. Blades and Mr. Colón, entered into an Engagement Contract with DISSAR Productions to hold the concert in May, 2003, at the Estadio Hiram Bithorn in San Juan, Puerto Rico.  (Docket No. 14-5.)  According to the contract, Mr. Colón and Mr. Blades were to receive a $350,000 all-inclusive fee, except for sound and lights, as compensation for their performance.  (Id. at 1.)  Mr. Blades and Mr. Colón would each receive fifty percent (50%) of the fee after all of the concert expenses were paid.  (Docket No. 56, at 5, ¶ 14.)

On May 4, 2007, seeking the collection of monies which he alleged were owed to him, Mr. Colón filed a complaint against Mr. Blades, Mr. Morgalo, and M.M.A. alleging that Mr. Blades was solely responsible for breaching the contract.  (Docket No. 1.)  On April 29, 2008, Mr. Colón filed an amended complaint to which Mr. Blades replied on May 9, 2008.  (Docket Nos. 45 & 48.)  On June 5, 2008, Mr. Blades sought indemnification from Mr. Morgalo in his personal capacity

CIVIL 07-1380 (JA)                    3

and as owner and member of M.M.A., and also from M.M.A. by filing a cross claim which was amended on July 29, 2008.  (Docket Nos. 49 & 56.)

Mr. Morgalo also filed a defamation claim against Mr. Blades and his company, Blades Productions, Inc., in the United States District Court for the Southern District of New York on May 2, 2008. (Docket No. 58-2.)  The claim was consolidated with this action on August 12, 2008.  (Id.)  On September 2, 2008, Mr. Morgalo answered Mr. Colón's amended complaint as well as Mr. Blades' amended cross claim (Docket Nos. 66 & 67) and on October 17, 2008, Mr. Blades answered Mr. Morgalo's defamation claim.  (Docket No. 73.)  That claim was dismissed on March 31, 2010.  (Docket No. 154.)

On April 21, 2009, Mr. Morgalo waived service of summons specifically on behalf of M.M.A. pursuant to Federal Rule of Civil Procedure 4(d).  (Docket No. 97.)  On February 2, 2010, Mr. Blades asked the Clerk of the Court to enter default against M.M.A. for its failure to plead or otherwise defend.  (Docket No. 118.)  See Fed. R. Civ. P. 55(a).  The Clerk entered default as to M.M.A. in relation to the amended cross-claim on February 25, 2010.  (Docket No. 128.)  Finally, Mr. Blades moved for default judgment as to M.M.A. on March 1, 2010. (Docket No. 133.)  Specifically, Mr. Blades asks for $143,000 in damages plus interest under the first cause of action, cost and attorneys fees, and judgment by default on all six causes of action of the amended cross-claim.  (Id.)  The default

CIVIL 07-1380 (JA)                    4

hearing was set for March 23, 2010 and then moved to and held on April 5, 2010. (Docket Nos. 141 & 144.)  On May 6 and May 7, 2010, Mr. Colón moved to voluntarily dismiss his claims against Mr. Blades, Mr. Morgalo, and M.M.A. (Docket Nos. 188 & 194.)   Mr. Colón's amended complaint was voluntarily dismissed on May 9, 2010.  (Docket No. 196).

## II.  STANDARD OF REVIEW

A judgment by default pursuant to Federal Rule of Civil Procedure 55(b) "is a 'final disposition of the case and an appealable order' that has the same effect as a judgment rendered after a trial on the merits."  U.S. v. $23,000 in U.S. Currency, 356 F.3d 157, 163 (1st Cir. 2004) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure Civil § 2684 (3d ed.  1998)).  "Pursuant to Rule 55(b), a [party] 'must apply to the court for a default judgment' where the amount of damages claimed is not a sum certain." Lang-Correa v. Díaz-Carlo, 672 F. Supp. 2d 265, 269 (D.P.R. 2009) (quoting Fed. R. Civ. P. 55(b)(2)).  The court may enter a judgment by default provided that "[i]f the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing." Fed. R. Civ. P. 55(b)(2); see U.S. v. $23,000 in U.S. Currency, 356 F.3d at 163-64.  Also, Rule 55(b)(2) provides that "[t]he court may conduct hearings . . . when . . . it needs

CIVIL 07-1380 (JA)                    5

to: . . . determine the amount of damages." Fed. R. Civ. P. 55(b)(2)(B).  Entry

of default by the Clerk "constitutes an admission of all facts well-pleaded in the

complaint." Metropolitan Life Ins. Co. v. Colón-Rivera, 204 F. Supp. 2d 273, 274

(D.P.R. 2002) (citing Banco Bilbao Vizcaya Argentaria v. Family Restaurants, Inc

(In re The Home Restaurants, Inc.), 285 F.3d 111, 114 (1st Cir. 2002)); see

Franco v. Selective Ins. Co., 184 F.3d 4, 9 n.3 (1st Cir. 1999).  Consequently, "a

defaulting [party will be precluded] from contesting liability."  Lang-Correa v.

Diaz-Carlo, 672 F. Supp. 2d at 269.  However, the court may "examine [the]

complaint to determine whether it alleges a cause of action."  Id. (quoting

Quirindongo Pacheco v. Rolón Morales, 953 F.2d 15, 16 (1st Cir. 1992)).  "Once

the entry of a default establishes the fact of damage, the trial judge . . . has

considerable latitude in determining the amount of damages."  Jones v.

Winnepesaukee Realty, 990 F.2d 1, 4 (1st Cir. 1993) (citing Sony Corp. v. Elm

State Elecs., Inc., 800 F.2d 317, 321 (2d Cir. 1986)).

## III.  FINDINGS OF FACT

At all relevant times, Mr. Morgalo and M.M.A. were involved in the business

of promoting and representing performers of salsa and Latin music.  (Docket No.

56, at 3, ¶ 7.)  Mr. Morgalo also was the owner, business proprietor, manager

member, principal, agent, servant, representative and/or employee of M.M.A., and

was acting within the course and scope of such ownership, membership, agency

CIVIL 07-1380 (JA)                    6

and employment.  (Id. ¶ 8.)  When the company was organized, Mr. Morgalo and co-owner Mr. Martínez assigned membership interest as follows:  fifty-one percent (51%) to Mr. Morgalo and forty-nine percent (49%) to Mr. Martínez.  Mr. Morgalo was and served as president of the company and Mr. Martínez was named vice president.  (Id. at 4, ¶¶ 9 & 10.)

On 2002, M.M.A. began negotiations for the performance of a reunion concert between Mr. Blades and Mr. Colón  to commemorate the album "Siembra" originally released in 1978 (hereinafter the "Siembra concert or show").  (Id. ¶ 12.)  On January 2003, M.M.A. executed an Engagement Contract with the Puerto Rican promoters DISSAR Productions and ROMPEOLAS for the performance on behalf of both Mr. Blades and Mr. Colón.  (Id. ¶ 13.)  In the fall of 2003, Mr. Martínez transferred and/or assigned his membership interest in the company to Mr. Morgalo, and Mr. Morgalo then became the sole owner and member of M.M.A. (Id. ¶ 11.)  The Engagement Contract provided that the fee payable to both artists-Colón and Blades-was $350,000, all-inclusive, except for sound and lights. (Id. at 5, ¶ 14.)  Mr. Blades and Mr. Colón would receive fifty percent (50%) of the fee after payment of concert expenses, including production and personnel, which were to also be split between Mr. Blades and Mr. Colón.  (Id.)

On or about February 2002, Mr. Morgalo and M.M.A. received $62,500 for a concert between Mr. Blades and Cheo Feliciano.  (Id. ¶ 15.)  However, the

CIVIL 07-1380 (JA)                         7

concert was cancelled and Mr. Blades never received the money.  (Id.)  Instead, M.M.A. applied the $62,500  as a "credit" toward the Siembra Concert, without the knowledge, consent or approval of either Mr. Blades or Mr. Colón.  (Id.)  Thus, the $62,500 are exclusively owed to Mr. Blades, over and above and independent from the balance of the fee owed to Mr. Blades for the Siembra Concert.  (Id.)  Despite owing money to Mr. Blades, M.M.A. charged and received a booking commission equal to ten percent (10%) of the fee, or $35,000 for the Siembra concert.  (Id. at 6, ¶ 16.)

        As booking agents Mr. Morgalo and M.M.A. served Mr. Blades and Mr. Colón in a fiduciary capacity and owed such fiduciary duties to act and handle the concert's affairs with the care, skill, and diligence a fiduciary rendering that kind of service would reasonably be expected to use.  (Id. ¶ 17.)  Mr. Morgalo and M.M.A. were also responsible for collecting and paying the fee to both artists, payment of musician salaries, travel and accommodation arrangements, transportation, security, etc.  (Id. ¶ 18.)

        The Engagement Contract provided that all payments were to be made by the promoters to M.M.A in the form of wire transfer, cash, certified check or money order payable to M.M.A.  (Id. ¶ 19.)  Mr. Morgalo and M.M.A. were required to make full payment to the artists prior to traveling to Puerto Rico.  (Id.)  Mr. Colón received an up front advance of $62,500 from M.M.A. while Mr. Blades

CIVIL 07-1380 (JA)                    8

received an up front advance of $68,000 from M.M.A.  (Id. ¶¶ 20 & 21.)  Mr. Morgalo and M.M.A. failed to make the scheduled payments of the balance of the fee to Mr. Blades and Mr. Colón under the terms of the Engagement Contract. (Id. at 7, ¶ 22.)

As of April 30, 2003, Mr. Morgalo and his partner Mr. Martínez could not be found to account for the money that was due to be paid to Mr. Colón and Mr. Blades.  (Id. ¶ 23.)  M.M.A. wrongfully misappropriated and/or converted the concert funds to its own use.  (Id. ¶ 24.)  Mr. Morgalo directly or indirectly, used or caused the balance of the fee due to Mr. Blades to be used to settle other M.M.A. debts, without the knowledge or consent of Mr. Blades.  (Id. ¶ 25.)  Mr. Morgalo knew or should have known that concert funds were withdrawn from the company account to pay other company debts.  (Id. ¶ 26.)  At all relevant times Mr. Morgalo maintained telephone or electronic communication with his partner Mr. Martínez to provide instructions and/or follow up with what debts and which creditors were to be paid using the money due to Mr. Blades and Colón under the Engagement Contract.  (Id.)  Mr. Morgalo and M.M.A. failed to inform Mr. Blades as to the payments made by the promoters under the Engagement Contract or to give information relevant to the affairs entrusted to the company as agents.  (Id. at 8, ¶ 27.)  Also, Mr. Morgalo failed to pay Mr. Blades in accordance with the Engagement Contract.  (Id. ¶ 28.)

CIVIL 07-1380 (JA)                        9

At the default hearing on April 5, 2010, Mr. Blades testified that he had business with M.M.A. since 1999.  (Docket No. 214, at 3:4-7.)  As far as Mr. Blades knew, Mr. Morgalo and Mr. Martínez were the sole owners of M.M.A.  (Id. at 3:8-10.)  According to Mr. Blades, he has performed in approximately ten shows with M.M.A. as his agent.  (Id. at 5:20-23.)  As an agency M.M.A. worked as a receptor.  (Id. at 5:24-25.)  It would receive inquiries and consult with Mr. Blades about the shows in which he would perform.  (Id. at 6:1-4.)  M.M.A. would also received funds in his behalf.  (Id. at 6:9-10.)  However, Mr. Blades would determined how much money was going to be charged, and when payment was going to be received.  (Id. at 6:11-16.)  Mr. Blades liked to receive payment in advance just in case a show did not go well.  (Id. at 6:17-20.)  Thus,  Mr. Blades would always try to figure out if the money was being paid on time.  (Id. at 7:15-17.)  Mr. Blades explained that M.M.A. would communicate with his business manager, Jerry Shustek, or with him, to say if the money had arrived.  (Id. at 7:18-21.)

M.M.A. would keep Mr. Blades informed as to available dates, and asked for his consent before committing to a date for a concert.  (Id. at 8:1-8.)  Mr. Blades expected M.M.A. to be truthful, and comply with its fiduciary duty with him.  (Id. at 8:9-12.) For its services M.M.A. usually received ten percent (10%) of the total amount of the show.  The percentage would vary if the show was big or small, or

CIVIL 07-1380 (JA)                    10

if it was a benefit performance.  (Id. at 8:13-23.)  M.M.A. also had the authority

to sign contracts on behalf of Mr. Blades.  (Id. at 9:1-3.)  As to how M.M.A. made

its payments to Mr. Blades, Mr. Blades explained that  M.M.A. would send the

funds to either Mr. Shustek or to himself.  (Id. at 9:4-8.)

        In  2002, Mr. Blades authorized M.M.A. to negotiate shows for him in the

Dominican Republic.  (Id. at 9:17-20 & at 10:1-16.)  Mr. Blades also authorized

M.M.A. to negotiate the Siembra Concert with Mr. Colón.  (Id. at 10:17-20.)  The

promoters of the concert were Ángel Rivas and César Sainz.  (Id. at 11:21-22.)

The fee for the concert was $350,000, of which M.M.A. would receive ten percent

(10%) for its services.  (Id. at 12:1-7.)  According to Mr. Blades he did not

negotiate on behalf of Mr. Colón.  (Id.  at 12:10-13.)  Mr. Blades testified that he

and Mr. Colón agreed to do the show, and that M.M.A. would take care of

expenses.  (Id. at 12:21-25 & at 13:1.)  Also, M.M.A. would take care of sound

and lights and Mr. Colón and Mr. Blades would have to take care of everything

else, such as hotels, airfares, per diems, musician's fees, rehearsal.  (Id. at 13:

3-7.)

        Mr. Blades received an advance of $68,000.  (Id. at 18:7-8.)  However, Mr.

Blades was not informed of the payments made by the Puerto Rico promoters to

M.M.A.  (Id. at 18:21-23.)  Mr. Blades, nevertheless, called M.M.A. to see whether

the funds had been sent, but was informed by Mr. Martínez that they had not

CIVIL 07-1380 (JA)                          11

received them.  (Id. at 18:24-25 & at 19:1-8.)  Mr. Blades stated during his testimony that he relied on the statements made by Mr. Martínez, because promoters do not always follow the schedule of payments. (Id. at 19:11-15.) Mr. Blades did not receive the full balance of the fee before the concert.  (Id. at 20:5-7.) At that time, Mr. Morgalo was in Iraq.  (Id. at 19:13-15.)  At one point, Mr. Blades called M.M.A. and told them that if he was not paid he would not perform at the concert.  (Id. at 19:23-25 & at 21:1-18.)  Mr. Blades talked to one of the promoters of the concert and was sent copies of the payments to M.M.A. by fax. (Id. at 23:1-8.)  According to Mr. Blades,  the promoters showed him a contract where it said that the $62,500 deposit  was being applied as an advance for the Siembra Concert.  (Id. at 23:20-25 & at 24:1-3.)

Mr. Blades testified that he never received $62,500 from M.M.A.  (Id. at 24:4-11.)  Also, Mr. Blades stated that he did not authorize or consent to the application of the $62,500 as a deposit to the Siembra Concert.  (Id. at 26:9-12.) Mr. Blades claimed that Mr. Rivas told him that Mr. Morgalo had authorized that arrangement.  (Id. at 27:9-19.)  Mr. Blades also testified that he never received the balance of his fee before performing the Siembra Concert.  (Id. at 27:22-24.)

A couple of weeks after the show Mr. Blades met with Mr. Martínez at Juan Toro's office weeks after the concert.  (Id. at 28:3-23.)  With Mr. Toro present,

CIVIL 07-1380 (JA)                              12

Mr. Martínez said to Mr. Blades that the company was going through a tough time because of some investments and that they started diverting funds  to resolve their economic problems.  (Id. at 29:10-17.)  With regard to the $62,500 that were missing, Mr. Martínez told Mr. Blades that they had received the money and that it was used to pay other debts.  (Id. at 30:10-19.)  Also, Mr. Martínez told Mr. Blades that the decision to divert funds was made by him and Mr. Morgalo. (Id. at 30:24-25 & at 31:1-4.)  The expenses for the Siembra Concert were $72,663.69.  (Id. at 33:1-25.)

After the concert, Mr. Blades went to the Treasury Department in Puerto Rico.  (Id. at 34:7-9.)  He explained to them that he could not pay the taxes because he had not received the money that was owed to him from the concert. (Id. at 35:1-19.)  Mr. Blades testified that M.M.A. was not entitled to the $35,000 commission given its betrayal of its fiduciary duty.  (Id. at 36:16-22.)  Mr. Blades never recovered the commission.  (Id. at 36:23-25.)

Mr. Ariel Rivas testified that he has worked as a promoter and a booking manager for 15 years.  (Id. at 43:20-24.)  He is licensed in different countries, such as Panamá, Costa Rica and the Dominican Republic.  (Id. at 44:4-10.)  Mr. Rivas also  owns Ariel Rivas Entertainment and is a partner in DISSAR Productions with Danny Rivera.  (Id. at 44:16-24.)  Mr. Rivas is Danny Rivera's agent.  (Id. at 44:25 & at 45:1.)

CIVIL 07-1380 (JA)                    13

Mr. Rivas testified that he met with Mr. Martínez and Mr. Morgalo in 2002. (Id. at 45:2-10.)  Mr. Rivas wanted to contract Mr. Blades to do a show in the Dominican Republic with Mr. Rivera.  (Id.)  The show did not take place.  (Id. at 45:21-25.)   In that same year Mr. Rivas and M.M.A. started a business relationship.  (Id. at 46:8-13.)  Mr. Rivas  proposed to Mr. Morgalo to do a show with Mr. Blades and Mr. Feliciano in Puerto Rico.  (Id. at 46:14-15.)  Mr. Morgalo said yes, and they came to an agreement.  (Id. at 46:16-18.)  The fee for  Mr. Blades was  $125,000 of which a fifty percent (50%) deposit was sent.  (Id. at 47:6-10.)   The amount paid as a deposit ($62,500) had to be paid in four transfers by May 2002.  (Id. at 48:4-7.)  The transfers were made to the M.M.A.'s account.  (Id. at 48:8-10.)  Although the show did not take place,  Mr. Rivas testified that Mr. Morgalo told him that there could be an anniversary celebration of the Siembra album.  (Id. at 48:18-25 & at 52:4-8.)  Mr. Rivas told Mr. Morgalo that he was interested in doing the show.  (Id. at 52:13-18.)  Mr. Rivas and Mr. Morgalo agreed on a $350,000 all inclusive fee for the participation of Mr. Blades and Mr. Colón's participation in the Siembra Concert.  (Id. at 53:5-7.)  According to Mr. Rivas, Mr. Morgalo proposed that the money that had been deposited to that point would be credited to the Siembra Concert.  (Id.)

The all inclusive term meant that all expenses were incurred by the artist up to when the artist reaches the stage presence, that is rehearsals, airfare, hotel,

CIVIL 07-1380 (JA)                    14

per diem, security, transportation.  (Id. at 53:21-25 & at 54:1-3.)  Mr. Rivas only

had to pay for the stage, sound, lights, and rentals.  (Id. at 54:4-5.)  The concert

was set in Puerto Rico, and M.M.A. went on to represent Mr. Colón and Mr. Blades.

(Id. at 54:19-20.)  The deal was closed on May 3,2003.  (Id. at 55:16-18.)  When

Mr. Rivas talked to Mr. Morgalo in relation to the Siembra Concert, Mr. Morgalo

said he had been called to go to Iraq.  (Id. at 55:19-25.)  At his going away party

in New York, Mr. Morgalo told Mr. Rivas that Mr. Martínez was going to be in

charge of the company.  (Id. at 56:12-22.)  Mr. Rivas claims that Mr. Morgalo

never told him that the company was under financial distress.  (Id. at 56:23-25

& at 57:1.)

On January 22, 2003, Mr. Rivas received a fax from M.M.A. confirming the

March 3, 2003 date for the concert at Hiram Bithorn Stadium.  (Id. at 58:9-16.)

Mr. Rivas also received a letter signed by Mr. Martínez confirming the date of the

concert.  (Id. at 58:1-12.)  Thirteen (13) wire transfers were made in total for

$351,000.  (Id. at 61:16-21.)  The first four were for the $62,500 that were

deposited for the show with Mr. Feliciano.  (Id. at 61:22-25 & at 62:1.)  The

amounts and dates of the deposits were $12,500 on May 21, 2002, $20,000 on

June 27, $20,000 on October 3, and $10,000 on October 29, 2002.  (Id. at 62:

2-5.)  All wire transfers were deposited in M.M.A.'s account in New York City.  (Id.

at 62:6-16.)  The fifth wire transfer to M.M.A. was on February 27, 2003, after

CIVIL 07-1380 (JA)                    15

getting the signed offer.  (Id. at 62:24-25 & at 63:1-4.)  The amount of the

transfer was for $72,500.  (Id. at 63:5-6.)  The remaining dates and amounts of

the remaining transfers are as follow:  (a)  the sixth payment was for $15,000

made on March 7, 2003; (b) the seventh payment was for $60,000 made on

March 25, 2003; (c) the eight payment was for $20,000 made on March 28, 2003;

(d) the ninth payment was for $10,500 made on April 8, 2003; (e) the tenth

payment was for $25,000 made on April 22, 2003; (f) the eleventh payment was

for $10,000 made on April 24, 2003; (g) the twelfth payment was for  $26,000

made on April  29, 2003; (h) the thirteenth payment was for $52,500 made on

April 30, 2003.  (Id. at 63:16-25 & at 64:1-2.)  Evidence of these payments was

sent to Mr. Blades five or six days prior to the concert.  (Id. at 64:5-13.)

       During his testimony Mr. Rivas was shown a copy of an engagement

contract.  (Id. at 65:18-23.)  Mr. Rivas examined the document and stated that

contract was different than the one that had been given to him.  (Id. 65:24-25 &

at 66:1.)  According to Mr. Rivas, the contract that was shown to him required a

deposit of $62,500 to be paid immediately while in the contract that was given to

him the $62,500 appeared credited.  (Id. at 66:15-18 & at 69:13-22.)  Also, Mr.

Rivas testified that after he realized that the $62,500 were missing, he explained

to Mr. Blades that the money had been sent to his representative, M.M.A., in April

2002 and credited to the Siembra Concert.  (Id. at 71:5-10.)  When asked if Mr.

CIVIL 07-1380 (JA)                    16

Blades had consented to the application of the credit, Mr. Rivas answered that he

only negotiated with Mr. Blades and Mr. Colón's representatives.  (Id. at 71:16-

19.)

Mr. Roberto Morgalo was called as an adverse witness.  (Id. at 78:11-12.)

He testified that he was the president of M.M.A. until January 16, 2003 when he

was called to active duty.  (Id. at 79:6-9.)  Mr. Morgalo reported to his unit on

January 16, 2003; a warning order had said to report on January 21,2003.  (Id.

at 80:3-13.)  Mr. Morgalo left the continental United States on March 23, 2003.

(Id.)    According to Mr. Morgalo, M.M.A. was formed in 1999 and was

administratively dissolved in 2005.  (Id. at 81:2-5 & at 82:6-7.)  Mr.  Morgalo

testified that as president he had a fifty one percent (51%) interest in M.M.A., had

the authority to sign contracts, and sought grants, sponsorships, and loans.  (Id.

at 82:8-25 & at 83:1-10.)  Also as an agent Mr. Morgalo was responsible for

finding  the  best  deals  for  his  clients.   (Id.  at  85:11-22.)   Mr. Morgalo

acknowledged that as an agent he owed a duty of diligence and loyalty to his

clients.  (Id. at 85:23-25 & at 86:1-2.)  Furthermore, Mr. Morgalo admitted that

he had a duty to let a client know when payments were received.  (Id. at 86:3-6.)

Mr. Morgalo testified that he received  an offer for a show in the Dominican

Republic with Mr. Blades.  (Id. at 88:4-6.)  However, according to Mr. Morgalo a

deal was not signed.  (Id. at 88:7-8.)  Mr. Morgalo also negotiated with Mr. Rivas

CIVIL 07-1380 (JA)                    17

to do another show with Mr. Feliciano but it was canceled by Mr. Rivas.  (Id. at 88:9-16.)  Mr. Morgalo admitted that even though the show with Mr. Feliciano had been canceled, Mr. Rivas made a deposit for $62,500.  (Id. at 88:17-21.) According to Mr. Morgalo, he notified Mr. Blades  about the payments that were made to M.M.A. (Id. at 88:22-24.)  When asked if Mr. Blades had agreed to apply the $62,500 as a deposit towards the February 16, 2003 show, Mr. Morgalo answered that Mr. Blades had not agreed.  (Id. at 91:9-11.)

Also during his testimony, Mr. Morgalo admitted that M.M.A. was in financial distress and that he applied for an economic injury disaster loan to the Small Business Association ("SBA").  (Id. at 97:4-16.)   The loan was approved in February of 2002.  (Id.)  The loan was used by Mr. Morgalo to pay other loans. (Id. at 97:20-25 & at 98:1-6.)  Besides the SBA loan, Mr. Morgalo testified that he received in that same year $100,000 from a sponsor as well as private and government grants. (Id. at 98:7-18.)  Mr. Morgalo denied talking to Mr. Martínez after he left to Iraq.  (Id. at 99:9-11.)  Also, Mr. Morgalo denied instructing Mr. Martínez to pay M.M.A.'s debts.  (Id. at 99:12-17.)  Mr. Morgalo admitted that prior to his deployment he had received a total of $350,000, not counting commissions, in 2002. (Id. at 101:3-7.)  While Mr. Morgalo was in Iraq he found out that something had happened with Mr. Martínez.  (Id. at 105:1-25 & at 106:1.)  Mr. Morgalo immediately called Mr. Blades but was not able to get a hold

CIVIL 07-1380 (JA)                    18

of him so he contacted Mr. Toro's office.  (Id. at 106:2-20.)  Mr. Morgalo testified

that Mr. Toro told him that Mr. Martínez had tried to commit suicide and that he

disappeared with the money, and that there was a show in Puerto Rico.  (Id. at

110:16-22.)  After learning of what had happened Mr. Morgalo wrote a letter to

Mr. Martínez asking for his cooperation to solve the problems with Mr. Blades and

M.M.A.  (Id. at 112-116.)  Mr. Morgalo also submitted an application to the SBA

for a loan enlargement.  (Id. at 117:12-15.)  The loan according to Mr. Morgalo

was to pay the money that was owed to Mr. Blades.  (Id. at 118:1-7.)

        With regard to payments made by Mr. Rivas, Mr. Morgalo  admitted that

M.M.A. received $62,500 in wire transfers.  (Id. at 154:8-12.)  According to Mr.

Morgalo, the wire transfers were not for the Siembra Concert.  (Id. at 154:13-15.)

Mr. Morgalo testified that the money sent was for the concert  between Mr. Blades

and Mr. Feliciano.  (Id.)  Mr. Morgalo testified that the $62,500 were never

assigned to the Siembra Concert.  (Id. at 160:11-15.)

        Mr. Arturo Martínez was a booking agent, treasurer, and a vice president at

M.M.A. (Id. at 168:3-9.)  According to Mr. Martínez he joined M.M.A. in February

of 2000 after the company was incorporated in December 1999.  (Id. at 169:3-6.)

Mr. Martínez testified that Mr. Morgalo was the one who negotiated the Siembra

Concert with Mr. Rivas.  (Id. at 169:25 & at 170:1-4.)  When asked if Mr. Blades

was sent the $62,500 deposit, Mr. Martínez answered that the money was never

CIVIL 07-1380 (JA)                    19

sent. (Id. at 171:24-25 & at 172:1-5.) Mr. Martínez testified that the money was used to pay M.M.A.'s debts. (Id. at 172:18-25 & at 173:1-5.) Also, Mr. Martínez testified that Mr. Morgalo knew that he had received money from Mr. Rivas. (Id. at 174:22-24.) Mr. Martínez admitted that he was the one responsible for withdrawing the money to pay the company debts. (Id. at 174:25 & at 175:1-4.) He also stated that the $62,500 was applied as a credit for the Siembra Concert. (Id. at 176:17-25.) According to Mr. Martínez, Mr. Rivas and Mr. Morgalo were the ones who agreed to apply the money as a credit. (Id. at 177:1-3.) However, neither Mr. Blades nor Mr. Colón authorized that the deposit be applied for the Siembra Concert. (Id. at 177:4-11.) Mr. Martínez acknowledged that he had the duty of informing Mr. Blades about the money. (Id. at 178:10-13.) Mr. Martínez testified that he and Mr. Morgalo kept in touch after Mr. Morgalo was deployed to Iraq, and that Mr. Morgalo was aware of the situation with M.M.A. (Id. at 180:5-24.) By May 2003 M.M.A. did not have enough money in its account to pay the fees owed to Mr. Blades and Mr. Colón. (Id. at 184:15-18.) Mr. Martínez stated that neither Mr. Blades nor Mr. Colón were aware that the money that was owed to them was being used to pay other debts. (Id. at 185:1-18.) Mr. Martínez transferred all his shares in M.M.A. to Mr. Morgalo. (Id. at 188:6-16.)

Mr. Martínez also admitted that as an officer of M.M.A. he did not act in an open, fair and honest manner with Mr. Colón and Mr. Blades. (Id. at 192:13-20.)

CIVIL 07-1380 (JA)                    20

Mr. Martínez testified that M.M.A. was not entitled to the commission that was charged for the Siembra Concert.  (Id. at 193:18-25 & at 194:1.)  Mr. Martínez admitted that he was aware of the loans and grants that Mr. Morgalo was applying for and that he participated in the process.  (Id. at 194:5-7.)

## IV.  CONCLUSIONS OF LAW

### A.  Jurisdiction

Cross-plaintiff Rubén Blades is a citizen of Panamá.   Cross-defendant Martínez, Morgalo & Associates, LLC ("Martínez & Morgalo" or "the Company") is and at all times herein mentioned was a limited liability company or corporation organized and existing under the laws of the State of Delaware doing business in the State of New York.

This cross-complaint is an action for damages that exceed $75,000, exclusive of interests, costs and attorney's fees.

### B.  Breach of Contract

When jurisdiction is based on diversity of citizenship, federal courts must apply state substantive law.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 92 (1938); Valenzuela Fuentes v. Dictaphone Corp., 334 F. Supp. 2d 94, 97 (D.P.R. 2004). Thus, Puerto Rico substantive law applies.

Under the freedom of contract principle "the contracting parties may establish the agreements, clauses, and conditions they may deem convenient,

CIVIL 07-1380 (JA)                              21

provided that they are not contrary to law, morals, or public order." <u>Soc. de Gananciales v. Vélez & Asoc.</u>, 145 D.P.R. 508, 516-17 (1998) (citing Puerto Rico Civil Code § 1207 (P.R. Laws Ann. tit. 31, § 3372 (1990)).  A contract under Puerto Rico law "has three elements: consent, a definitive (and legal) object, and consideration." <u>Citibank Global Mkts., Inc. v. Rodríguez-Santana</u>, 573 F.3d 17, 24 (1st Cir. 2009).  "[O]nce a contract is perfected, the parties are bound to comply with what has been expressly stipulated and to bear the consequences derived from the same in accordance with good faith, use, and law." <u>Soc. De Gananciales v. Vélez & Asoc.</u>, 145 D.P.R. at 517 (citing Puerto Rico Civil Code § 1210 (P.R. Laws Ann. tit. 31, § 3375 (1990)).  "[W]hen the breach of a contractual obligation causes harm to any of the contracting parties, an action for damages for breach of contract lies." <u>Id.</u> at 508.  The Puerto Rico Supreme Court has held that in order to succeed in a breach of contract claim:

> there must have been a meeting of minds that gave rise to an obligation, situation, or state of law resulting from an agreement, and that created certain expectations on the basis of which the parties acted. Ordinarily, each party trusts that the other party will comply with what has been freely agreed upon, in keeping with the binding nature of contracts and with good faith. A voluntary act or omission that results in the breach of a previously constituted obligation gives rise to an action for contractual damages.

<u>Soc. De Gananciales v. Vélez & Asoc.</u>, 145 D.P.R. at 517.  However, "[t]he Puerto Rico Civil Code distinguishes between damage resulting from breach of contract

CIVIL 07-1380 (JA)                    22

. . . and damage resulting from breach of obligations and duties imposed by nature and by law that are necessary for social coexistence ...." Soc. De Gananciales v. Vélez & Asoc., 145 D.P.R. at 521 (citing P.R. Laws Ann. tit. 31, §§ 3018 & 5141 (1990)). "Actions *ex contractu* are based on the breach of a duty that arises from an express or implied contract, and seek fulfillment of promises agreed to by the contracting parties." Id. (citing Ramos-Lozada v. Orientalist Rattan Furniture Inc., 130 D.P.R. 712, 727 (1992)). On the other hand, an *ex delicto* action "does not stem from the will of the parties, but from the breach of some obligation and duties imposed by law[,]" "which ordinarily arises out of a negligent or wrongful act unconnected with any contract between the parties, but may rise either independently of any contract or by virtue of certain contractual relations . . . ." Santiago-Nieves v. A.C.A.A., 119 D.P.R., 711, 716-17, 19 P.R. Offic. Trans. 755, 760-61 (1987). To that effect, "an action for damages for breach of contract . . . only lies when the damage suffered exclusively arises as a consequence of the breach of an obligation specifically agreed upon, which damage would not occur without the existence of a contract." Ramos-Lozada v. Orientalist Rattan Furniture Inc., 130 D.P.R. at 727. Nevertheless, "a claim for noncontractual damages resulting from the breach of a contract lies if the act that caused the damage constitutes a breach of the general duty not to injure anyone and, at the same time, a breach of contract." Id. If a claim for noncontractual

CIVIL 07-1380 (JA)                        23

damages exists, a plaintiff may only be able to choose either a tort claim or a contract claim but not both.  See Ramos-Santiago v. Wellcraft Marine Corp., 93 F. Supp. 2d 112, 116 (D.P.R. 2000).

Conduct that breaches a fiduciary duty is an example of a noncontractual damages claim.  In re Evangelist, 760 F.2d 27, 31 (1st Cir. 1985) (holding that "conduct that breaches a fiduciary duty . . . might constitute a tort (such as fraud) or breach of contract."); see also Quinlan v. Koch Oil Co., 25 F.3d 936, 943 (10th Cir. 1994) (holding that when a breach of fiduciary duty does arise from contract, the injured party must "choose whether to sue for breach of contract or for tort.") An agent "is a fiduciary [who] is required to exercise fidelity and the utmost  good faith, loyalty and honesty toward his principal at all times." An-Port, Inc. v. MBR Indus., Inc., 772 F. Supp. 1301, 1314 (D.P.R. 1991).  "The primary obligation imposed on an agent by the fiduciary duty of loyalty is to avoid self-dealing with regard to the business of the principal." Richard A. Lord, 19 Williston on Contracts § 54:28 (4th ed.)  "[A]n agent, may not take part in any transaction adverse to the interests of the principal without obtaining the principal's permission, after full disclosure of all facts that might affect the principal's decision." Id.

C.  Damages

"Under Puerto Rico law, when a party breaches a contract, he is liable to the aggrieved party for damages which were foreseen or may have been foreseen."

CIVIL 07-1380 (JA)                    24

Oriental Fin. Group, Inc. v. Fed. Ins. Co., 483 F. Supp. 2d 161, 165 (D.P.R. 2007).

But "when a party acts with bad faith ("dolo") in breaching a contract, the

aggrieved party may recover all damages that originate from the nonfulfillment

of the obligation." Id. (citing P.R. Laws Ann. tit. 31, § 3024 (2004)).  If a claim

is noncontractual in nature, a party may seek damages pursuant to Article 1802

of the Puerto Rico Civil Code which provides, in its pertinent part, that "[a] person

who by an act or omission causes damage to another through fault or negligence

shall be obliged to repair the damage so done."  P.R. Laws Ann. tit. 31 § 5141.

In order to prevail in an Article 1802 claim, "a plaintiff must prove, by

preponderance of the evidence, the following elements:  (1) an act or omission

constituting fault or negligence; (2) injuries; and (3) a casual connection between

the act or omission and the injuries." In re Caribbean Petroleum, LP, 561 F. Supp.

2d 194, 199 (D.P.R. 2008) (citing Admor, F.S.E. v. Almacén Ramón Rosa, 151

D.P.R. 711, 725 (2000)).  "The principle underlying the calculation of damages is

clear: damages in Puerto Rico are compensatory." In re Caribbean Petroleum, LP,

561 F. Supp. 2d at 199 (citing Torres v. Castillo Alicea, 111 D.P.R. 792, 804 & n.

7 (1981); Pérez v. Sampedro, 86 D.P.R. 526, 530 (1962)).  "When determining

the amount of damages that a party is entitled to recover, however, the courts

'must not lose sight of the fact that [Article 1802], being a remedial statute,

should be liberally construed to accomplish its purpose."   In re Caribbean

CIVIL 07-1380 (JA)                    25

_Petroleum, LP_, 561 F. Supp. 2d at 199 (quoting _Rivera Colón v. Díaz Arrocho_, 165 D.P.R. 408, 427 (2005) (citing _Dorante v. Wrangler_, 145 D.P.R. 408 (1998); and _Muñoz-Hernández v. Policía de P.R._, 134 D.P.R. 486 (1993)).

Article 1061 of the Puerto Rico Civil Code, provides that "[s]hould the obligation consist in the payment of a sum of money, and the debtor should be in default, the indemnity for losses and damages, should there not be a stipulation to the contrary, shall consist in the payment of the interest agreed upon, and should there be no agreement, in that of the legal interest."  P.R. Laws Ann. tit. 31, § 3025.  Under the law of Puerto Rico, interest has to be awarded from the moment the complaint is filed until judgment is entered even when no stipulation has been made.  See _Noble v. Corporación Insular de Seguros_, 738 F.2d 51, 55 (1st Cir. 1984); _Salgado v. Villamil_, 14 D.P.R. 449 (1908); and P.R. Laws Ann. tit. 32, Ap. III, R. 44.1(d).

In this case, there is contractual liability and tort liability.  By converting the payments made by the promoters for its own use, and by failing to make payments to Mr. Blades, M.M.A. breached the engagement contract and its fiduciary duties.  The person aggrieved as a result of the double violation is Mr. Blades.  The double violation was committed by M.M.A.  See _Ramos-Lozada v. Orientalist Rattan Furniture Inc._, 130 P.R. Dec. at 725.  As such, Mr. Blades had

CIVIL 07-1380 (JA)                    26

a right to choose to sue for breach of contract or for tort.  Based on the damages

sought it in can be inferred that the contract claim instead of the tort claim was

elected.  Consequently, upon reviewing the Engagement Contract (Docket No. 14-

5) the court finds that M.M.A. failed to comply with the terms of said agreement.

According to the contract, the fee for the Siembra Concert was $350,000.

Mr. Blades and Mr. Colón were supposed to receive fifty percent (50%) each of

whatever was left after all the concert expenses were paid.  However, that did not

happened.  Although Mr. Blades complied with all conditions, covenants, and

promises in accordance with the Engagement Contract, he  only received an

advance of $68,000 for his services after the payments were sent by Mr. Rivas to

M.M.A.'s account.

The contract specified that Mr. Blades had to be paid 14 days prior to his

departure for Puerto Rico.  (Docket No. 14-5, at 1.)  M.M.A., however, failed to

make the scheduled payments of the balance of the fee to Mr. Blades under the

terms of the Engagement Contract.  Instead, the monies owed were used to settle

other M.M.A. debts without the knowledge or consent of Mr. Blades.  Specifically,

M.M.A. applied $62,500 that had been deposited by Mr. Rivas for a concert

between Mr. Blades and Mr. Feliciano as a credit for the Siembra Concert without

Mr. Blades' authorization.

CIVIL 07-1380 (JA)                           27


Based on the foregoing it is clear that M.M.A. breached the terms of the Engagement Contract and is therefore liable to Mr. Blades for the losses suffered. Accordingly the court finds that after deducting the advances ($130,500) and expenses for the Siembra Concert ($72,663.69), Mr. Blades is entitled to damages in the amount of $70,668.16.  Also, since the deposit made by Mr. Rivas for the concert between Mr. Blades and Mr. Feliciano was misappropriated, M.M.A. must pay Mr. Blades $62,500 in additional damages.

Furthermore, although payment of interest was not expressly stipulated in the Engagement Contract, Mr. Blades is entitled to prejudgment interest from the date the amended cross-claim was filed until judgment is entered.

In view of the above, and having determined that there is no just reason for delay, I am directing the Clerk to enter a partial final judgment in favor of Rubén Blades against Martínez, Morgalo & Associates, LLC, in the amount of $133,168.16, plus interest at the legal rate, beginning on June 5, 2008.

At San Juan, Puerto Rico, this 15th day of June, 2010.

S/ JUSTO ARENAS
Chief United States Magistrate Judge