IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ROBERT MORGALO,<br><br>       Plaintiff,<br><br>       v.<br><br>RUBÉN BLADES and RUBEN BLADES PRODUCTIONS, INC.,<br><br>       Defendants. | Civil No. 07-1380 (BJM) |

### OPINION IN A NON-JURY TRIAL

To commemorate the twenty-fifth anniversary of *Siembra*, their hallmark salsa album, Willie Colón and Rubén Blades performed a reunion concert in San Juan, Puerto Rico. Their fee was handled by the booking agency Blades was then using, Martínez, Morgalo & Associates, Inc. But something went wrong with the money, and life gave Blades a surprise when Colón sued in 2007.

Reacting at a press conference, Blades said he and Colón were both "robbed" by Martínez and Morgalo. Robert Morgalo then sued Blades and Ruben Blades Productions, Inc. ("RBPI") for defamation. His diversity suit was originally brought in the Southern District of New York, but it was voluntarily transferred and consolidated with Colón's then-pending case here. The claims in Colón's case have since been resolved.

Morgalo's case was tried without a jury on February 11, 2013. The court heard testimony from Rubén Blades, Ariel Rivas, Arturo Martínez, and Juan Toro, and admitted ten exhibits. A transcript was prepared. Docket No. 356 ("Tr."). The parties filed a partial stipulation of facts and post-trial briefs. *See* Docket Nos. 346 ("St."), 358 ("Def. Br."), 359 ("Pl. Br."), 362 ("Pl. Reply"), and 361 ("Def. Reply"). In light of the findings of fact and legal discussion set forth below, Morgalo's action is **dismissed on the merits.**

## FINDINGS OF FACT

1. The company Martínez, Morgalo & Associates, Inc. ("M&M") was formed by Robert Morgalo and Arturo Martínez around November 1999. Its business purpose was to provide booking and management agency services, including road managing for musical artists. Its stockholders were Morgalo (owning fifty-one percent) and Martínez (with forty-nine percent). Morgalo was its President, and Martínez its Vice President. St., ¶¶ 11–14.

2. M&M had offices in New York City. Both Martínez and Morgalo had authority to inspect, access, and draw checks on M&M's bank accounts. Martínez Test., Tr. 110:10-15, 115:6-19.

3. M&M acted as Blades' agent and representative. St., ¶ 15.

4. M&M produced fifteen concerts from June 2001 to December 2002 at the Apollo Theater in New York. St., ¶ 21. The Apollo Theater series was not financially successful; by December 2002, M&M had run up debts to radio stations, newspapers, artists, private lenders, and the Small Business Administration. Martínez Test., Tr. 112:2–113:21.

5. Morgalo hired Danny Rivera, a client of Ariel Rivas, to perform in New York in September 2001, but the show was canceled after the September 11 attacks. Rivas later approached Morgalo about holding a concert featuring Blades and Rivera in the Dominican Republic in 2002. The Blades/Rivera show did not happen as Rivas planned; Rivas was incommunicado during a three-day trip, and Morgalo meanwhile directly set up a deal that did not include Rivera. Rivas Test., Tr. 68:18-20, 69:17– 70:10.

6. Morgalo, as an M&M employee, negotiated with César Sainz of Rompeolas to book a show for Blades in Puerto Rico, together with Cheo Feliciano. St., ¶ 2. Rivas was also involved in the Blades/Feliciano planning. The date they first chose coincided with another salsa concert featuring Richie Rey and Bobby Cruz. Rivas Test., Tr. 70:17-23. Rivas's company paid M&M a $62,500 deposit for the Blades/Feliciano concert. Rivas Test., Tr. 71:3-18; Martínez Test., Tr. 116:19-24. Although Martínez believed he and Morgalo were obligated to tell Blades about this deposit, they never did. Martínez Test., Tr. 118:17-25. Rivas and Morgalo

first planned to reschedule the Blades/Feliciano concert for February 2003. Rivas Test., Tr. 71:8-22.

7. M&M had produced other shows with Blades in 2002. Martínez Test., Tr. 154:16–155:16.

8. In lieu of rescheduling the Blades/Feliciano concert, Morgalo proposed what wound up being the *Siembra* concert: a show in Puerto Rico reuniting Blades and Colón. Rivas and Morgalo discussed possibilities for taking the *Siembra* reunion show to more cities and dates. Rivas Test., 71:21–72:3, 73:3-16.[1]

9. Morgalo told Rivas that the $62,500 that had already been paid could be credited towards the fee for the San Juan *Siembra* concert. Rivas Test., Tr. 72:4-9.[2] But M&M used that money to cover other debts and expenses. Martínez Test., Tr. 119:1–13. Rivas wired an additional $287,500 to M&M. Rivas Test., Tr. 74:5-17. M&M wired $50,000 to "Ruben Blades Productions Inc. LA" in late 2002. Martínez Test., Tr. 150:4–151:17; Exhs. 9, 10.

10. Rompeolas, acting through Cesar Sainz, and Dissar Records, acting through Ariel Rivas, were the promoters of the *Siembra* concert. Sometime in January 2003, M&M executed an engagement contract with the Puerto Rico-based promoters Dissar Productions and Rompeolas for the performance of the *Siembra* concert.[3] The concert was to be held on May 3, 2003 in San Juan, Puerto Rico. The engagement contract provided that the fee payable to both artists was $350,000 in U.S. dollars, "all-inclusive" except for sound and lights. M&M was the booking agency for the *Siembra* concert. M&M was to receive a ten percent ($35,000) commission in connection with the *Siembra* concert. Blades and Colón would each receive from M&M one-half of the all-inclusive fee after payment of concert expenses, which were also to be split equally between Blades and Colón.

---

[1] Morgalo claims "[t]here has never been evidence" that Rivas negotiated with Morgalo for the *Siembra* concert. Pl. Reply at 10. Perhaps he means *documentary* evidence, but Rivas's uncontradicted and unimpeached firsthand testimony is competent evidence all the same. This anemic "no evidence" objection springs up in a few other places throughout Morgalo's briefing; though not noted in every instance, I wholly reject it.

[2] Whether Morgalo and Rivas agreed on this term in writing was the subject of extensive cross-examination. However, Rivas never altered his original position about the agreement to cross-apply $62,500, and Morgalo did not introduce any written contract into evidence, nor did he put on any contradictory testimony.

[3] Though the parties stipulated to the existence of a contract, they did not stipulate to the admission of any written contract.

        Morgalo admitted that M&M had "no separate mind, will, or existence of its own" with respect to the *Siembra* concert. St., ¶¶ 9, 16–19, 22–24.

11. On January 16, 2003, Morgalo received a warning order from the U.S. Army to report to Bethlehem, Pennsylvania on January 21, 2003. Before Morgalo reported to base in Pennsylvania, there was a farewell party at Morgalo's house. St., ¶¶ 3, 20. Rivas recalled that the party happened around January 18, 2003; there, Morgalo told him to keep in contact with Martínez, that he would come back, and that "everything would run the same." Rivas and Morgalo spoke on the phone "practically every day" about the upcoming show until January 19, 2003. Rivas heard from Morgalo only one more time before the concert. He called shortly before shipping out about a potential sponsorship deal with Presidente beer if the show went to the Dominican Republic. Rivas Test., Tr. 75:6-17, 75:21–77:2, 77:18–78:4.

12. No written letter or corporate resolution marks Morgalo's resignation or substitution as president of M&M. St., ¶ 4.

13. On January 21, 2003, Rivas wrote to Martínez about the timeframe and logistics of radio promotions for the *Siembra* concert. Among other details, he proposed that the artists' fee be reduced to $300,000 so that additional promotions could be purchased. Rivas Test., Tr. 98:6–102:12; Exh. 6. On January 22, 2003, Martínez wrote a letter to Rivas confirming the May 3 concert date. Rivas Test., Tr. 104:20-23; Exh. 7.

14. M&M's New York office closed sometime in "early" 2003, and the *Siembra* concert was the company's last project. Martínez Test., Tr. 109:25–110:5.

15. About a week before the concert, Blades believed he and Colón had not yet been paid in full. He told a reporter for *El Nuevo Día* that he doubted the concert would happen because neither he nor Colón had been paid in full. Blades Test., Tr. 14:19–15:3, 36:19–37:3. Rivas heard about this comment from the reporter. He tried, unsuccessfully, to reach Blades through M&M. Rivas eventually got in touch with Blades and gave him proof of money being wired. Rivas Test., Tr. 78:23–79:16, 79:20–80:2.

16. A press conference was held on May 2, 2003 at Restaurant El Zipperle in San Juan, Puerto Rico concerning the *Siembra* concert. St., ¶ 25. The promoters wanted Blades to reassure the public that the concert would go on. When asked whether he believed that the concert money had been stolen, Blades responded that the money was not accounted for. Blades Test., Tr. 15:8-10, 15:15–16:9.

17. Martínez attempted suicide on April 29, 2003. St., ¶ 5. Shortly before or after the concert, Martínez gave Juan Toro access to M&M's account; Martínez was unsure how much money it had at that time, or what withdrawals were made. Martínez was hospitalized at the time, and gave Toro the bank access code so he could withdraw money for Blades. Martínez Test., Tr. 149:19–150:3, 155:23–156:10.

18. Through various agencies, Toro has worked in the music industry for about thirty-nine years. Following the *Siembra* concert, Toro felt Morgalo had garnered a reputation in the industry for being "scattered and irresponsible," and that the industry was "scared to do dealings with him." Toro Test., Tr. 159:21-24, 171:25–172:9. Rivas has not worked with M&M or Morgalo again. Rivas Test., Tr. 81:24–82:5. Toro said that Morgalo's reputation in the music industry today is "non-existent," and that his past associates have said they would not work with him again. Toro Test., Tr. 174:17-21.

19. In a letter dated May 14, 2003, Blades wrote to Colón:

> I also want Arturo to clarify the extent of Roberto Morgalo's involvement in this situation. So far, Arturo is the one we all have focused on. But it seems to me it's obvious Morgalo had a hand as well in the embezzlement and it's in Arturo's personal interest to explain what role the latter played in this.
>
> . . .
>
> As for Arturo and Morgalo: the only reason I have waited before going through with a criminal action against them is that we need to understand what was the final amount stolen.

    Blades Test., Tr. 20:1-6, 22:2-12; Exh. 4.

20. In a letter dated May 15, 2003, Blades wrote to Toro: "First of all, thanks for all the help you have given us to try and sort out the mess created by Martínez & Morgalo's larcenous conduct." Blades Test., Tr. 23:1-6; Exh. 5. In a letter titled

"Report on expenses for the May 3rd show" and dated "[a]s of May 16th," Blades wrote to Colón that $62,500 had been "stolen" in 2002, and that $63,033.20 had been "stolen" in 2003. Blades Test., Tr. 17:17-20; Exh. 3.

21. Sometime in June or July 2003, Blades met with Martínez and Toro at Toro's offices. Blades had demanded a meeting with Martínez because he still believed he had not gotten paid. Martínez explained to Blades that M&M had liquidity problems, and that he and Morgalo had agreed to divert Blades's money to cover the company's debts. Blades recalled Martínez telling him about both the $62,500 deposit and other *Siembra* money, but Martínez did not clearly remember what amounts were discussed. Blades Test., Tr. 37:8–40:1; Martínez Test., Tr. 131:17-22, 132:6-13. [4]

22. In August 2003, Martínez pleaded guilty to drug trafficking in Georgia, and was sentenced to fifteen years' incarceration; he served about five years before being released on parole. Martínez Test., Tr. 133:2–134:10. While Martínez was in prison, Morgalo wrote a letter saying he intended to seek a loan to M&M to resolve the monies owed to Blades. St., ¶ 8. In response, Martínez wrote a notarized letter to Morgalo, intending to give over his share of M&M. Martínez Test., Tr.; Tr. 134:11–139:16; Exh. 8.

23. Martínez now works for The Relentless Agency. St., ¶ 6. Juan Toro is The Relentless Agency's sole owner. Toro Test., Tr. 158:25–159:1.

24. Blades recalls speaking with Morgalo sometime around 2004, and that Morgalo said he was trying to get money to repay Blades. Blades maintains he has never been repaid, and conceded that he never asked Morgalo for his version of what happened. Blades Test., Tr. 40:12-19, 48:4-5.

25. On May 4, 2007, Colón sued Blades for breach of contract. St., ¶ 26. Blades first learned of the suit by reading reports in a newspaper. Blades Test., Tr. 24:1. On May 8, 2007, Blades held a press conference in Panama regarding Colón's suit, which was the subject of stories by the Associated Press and People En Español.

---

[4] With respect to Blades, this line of questioning was allowed over Morgalo's hearsay objection and limited to showing Blades's state of mind by the time he gave the 2007 press conference. Morgalo's counsel agreed to this limitation. Tr. 38:10-19. But as noted, Martínez also testified firsthand about his conversation with Blades.

St., ¶¶ 10, 28. The press conference and all of Blades's remarks were in Spanish. Blades Test., Tr. 36:2-7. At the time of Colón's suit, Blades was serving as Minister of Tourism for the Government of Panama. St., ¶ 27. Officials in the Panama tourism department called the conference so Blades could refute the allegation that Blades kept Colón's money. Blades believed that these allegations undermined his image as a public official. Blades Test., Tr. 24:11-25:5, 26:8-11. Blades was reported as saying "*nos robaron a los dos*"—translated by a certified interpreter as "[t]hey robbed both of us"—and that Martínez and Morgalo "misspent" half of the money. Exhs. 1 and 2. Blades says he understood that phrase to mean he and Colón "got robbed," "got screwed," and "were had" by M&M, and *not* that "[t]hey robbed us." During the conference, he always mentioned "Martínez and Morgalo," without separately identifying either Arturo Martínez or Robert Morgalo. Blades Test., Tr. 26:21–27:5, 27:12-16.

26. Martínez admitted that he was the one responsible for withdrawing the money to pay the M&M debts. St., ¶ 31.

27. M&M was found liable by default to Blades, and a hearing on damages was held on April 5, 2010. Colón voluntarily dismissed his suit against Blades, Morgalo, and M&M on May 9, 2010. The court found that M&M breached the terms of the engagement contract and found it liable to Blades in the amount of $133,168.16, plus interest at the legal rate, beginning on June 5, 2008. This judgment remains unpaid. St., ¶¶ 29, 30, 32.

## DISCUSSION

Morgalo seeks to recover damages for defamation arising from Blades's 2007 press conference. The parties stipulated that New York law governs his claim. Docket No. 329. Under New York law, a defamation plaintiff must prove "that the defendant published to a third party a defamatory statement of fact that was false, was made with the applicable level of fault, and either was defamatory *per se* or caused the plaintiff special harm, so long as the statement was not protected by privilege." *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011). But "it is 'fundamental that truth is an absolute, unqualified defense to a civil defamation action,' and 'substantial truth' suffices

to defeat a charge of libel." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) (quoting *Fairley v. Peekskill Star Corp.*, 445 N.Y.S.2d 156, 159 (App. Div. 1981) and *Commonwealth Motor Parts Ltd. v. Bank of Nova Scotia*, 355 N.Y.S.2d 138, 141 (App. Div. 1974), *aff'd*, 339 N.E.2d 888 (N.Y. 1975)); *Ingber v. Lagarenne*, 750 N.Y.S.2d 172, 173-74 (App. Div. 2002) (applying substantial truth test in mixed libel and slander case); *Carter v. Visconti*, 650 N.Y.S.2d 32, 33 (App. Div. 1996) (same in pure slander case).

Here, Blades has established the substantial truth of his statement. The test under New York law is whether "the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation." *Guccione*, 800 F.2d at 302-03 (citing *Fleckenstein v. Friedman*, 193 N.E. 537 (N.Y. 1934) and *Cafferty v. S. Tier Publ'g Co.*, 123 N.E. 76 (N.Y. 1919)). The facts and holding of *Guccione* are instructive. Robert Guccione, the publisher of *Penthouse* magazine, sued the corporations behind *Hustler* magazine and its publisher, Larry Flynt, over a 1983 article in which Flynt wrote Guccione "is married and also has a live-in girlfriend . . . ." *Id.* at 299. In fact, Gucione had actually been "married in 1956, separated in 1964, and divorced in 1979," and began living with his girlfriend in 1966. *Id.* Guccione alleged defamation *per se* in light of New York's criminal adultery statute, and a jury awarded one dollar in nominal damages and a total of $1.6 million in punitive damages.

The Court of Appeals found error in the jury instructions and reversed, holding both (1) that Flynt's statement was substantially true, and (2) that Guccione was a libel-proof plaintiff. Regarding substantial truth, the court explained:

> The published statement read, "Considering he is married and also has a live-in girlfriend, Kathy Keeton... we wonder if he would let either of them pose nude with a man." Substituting the truth for the false statement yields the following: "Considering that from 1966 to 1979 he was married and also had a live-in girlfriend, Kathy Keeton... we wonder if he would let either of them pose nude with a man." The only difference in effect between the two statements worked in Guccione's favor; as printed, the

> statement merely points out the fact of his adultery, without calling attention to its duration for thirteen of the preceding seventeen years.
>
> . . .
>
> Of course, "former long-time adulterer" would have been more precise. But on the facts of this case, to require such a level of accuracy is unreasonable. The article labels Guccione an adulterer. The average reader would understand that term to include a man who unabashedly committed adultery for thirteen of the last seventeen years and whose adulterous behavior ended only because his wife ultimately divorced him. Where, as here, "the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done."

*Id*. at 302-03 (quoting *Cafferty*, 123 N.E. at 78).

Without crediting Blades's opinion of how literally his remark should be translated, *see* Tr. 27:12-16, saying that he was "robbed" by Morgalo was substantially true. A preponderance of the evidence shows that Morgalo's company accepted Colón and Blades's performance fees for the *Siembra* concert, as well as earlier concerts by Blades alone. M&M was behind on its debts, and Martínez and Morgalo both agreed to use *Siembra* fees to service those debts. This began well before Morgalo left for Iraq; as Martínez put it, by 2002 they were already robbing Peter to pay Paul. *See* Tr. 127:14-19 (discussing the use of $100,000 in advances on 2003 financing to pay debts). So instead of saying "Martínez and Morgalo robbed both of us," Blades perhaps could have said that "Martínez and Morgalo used both of our money to pay their company's debts without our permission, and still haven't paid us in full." Regardless, I find the impact on Morgalo's reputation in the industry would be the same, and therefore conclude that Blades's statement was substantially true under New York law.[5]

---

[5] Blades further contends, in passing, that his statement "involved a matter of public concern" because he was a public minister in Panama, and Colón alleged that Blades kept the *Siembra* money. Blades concludes that Morgalo must prove Blades acted with First Amendment "actual malice," and that he did not. Def. Br. at 22. Since Blades prevails on his state-law defense, it is not necessary to scrutinize any constitutional boundaries on Morgalo's claim. For the same reason, I do not pass on Blades's assertion of various state-law privileges.

Morgalo v. Blades, Civil No. 07-1380 (BJM)                                                                                         10

Morgalo's contrary arguments fall short.  First, Morgalo highlights the fact that the tort and contract claims against him were dismissed at summary judgment.  But this is a red herring.  Blades's failure to maintain his civil claims does not, one way or the other, bear on the truth of whether Morgalo was involved in his company's loss of *Siembra* money.  And Morgalo's involvement in that loss—not his liability *vel non*—determines the frame of reference for the substantial truth defense.

Morgalo next attacks Rivas's testimony about the *Siembra* negotiations, complaining that the key point of the narrative—that they agreed $62,500 from the cancelled Blades/Feliciano show would be credited against the Siembra fees—was never "authenticated" by reference to a written contract or bank statement.  *Cf.* note 1, *supra*.  Morgalo therefore concludes that the substantial truth defense fails because "no amounts were ever stolen, robbed, embezzled[,] or taken" from Blades.  Pl. Br. at 9.  At best, the absence of such corroboration perhaps allows doubt about whether Morgalo had agreed to accept $62,500 less in new money for *Siembra*.  But the burden of proof in a New York civil case is only a fair preponderance of the evidence.  *See, e.g.*, *Jarrett v. Madifari*, 415 N.Y.S.2d 644, 649 (App. Div. 1979).  Despite extensive cross-examination, Morgalo did not elicit anything undermining Rivas's account, notwithstanding some evasiveness in identifying a possible written contract.  On balance, I found Rivas's testimony sufficiently credible on this point.  And since Morgalo neither introduced any written contract nor put on conflicting testimony (such as his own), I find Rivas's version to be more likely true than not.

Morgalo also indirectly suggests that Juan Toro or Martínez's wife became responsible for M&M's remaining money once Martínez turned over the bank access code in the hospital.  Morgalo was in Iraq by that time, and now takes particular umbrage to the fact that Blades, Martínez, Rivas, and Toro have all chosen not to hear out "his story."  From all this, he reasons that the precise amount at issue remains unclear.  But Blades is not seeking (in this action, at least) to recover a sum for the concert.  His

defense is adequately served by the evidence that M&M paid its creditors out of Blades and Colón's money, and that the matter had not been settled by May 2007.

Morgalo further argues that the default judgment against M&M was flawed because he "was not allowed to cross[-]examine Ruben Blades Productions, Inc. witnesses," and that "the judgment was given for amounts the promoters never paid as evidenced by Rivas['s] testimony" at this trial.  Pl. Mem. at 9-10.  But Blades's substantial truth defense was more than adequately supported by the live, cross-examined testimony described above, together with Morgalo's counseled stipulations.   This makes Morgalo's contention irrelevant—finding Blades's statement substantially true does not depend on the fact of M&M's default judgment.  I therefore give no further consideration to Morgalo's complaints about the default proceedings, particularly given that this is not an appeal or rehearing of that action.

I note that Morgalo correctly observes that under the doctrine of defamation *per se*, a serious crime can be imputed even when not precisely named.  Pl. Br. at 8 (citing *Liberman v. Gelstein*, 590 N.Y.S.2d 857, 861 (N.Y. 1992) (noting that "'there is a cop on the take from Liberman' charges a serious crime—bribery," but affirming summary judgment on other grounds)).  But establishing defamation *per se* merely relieves Morgalo of his burden to prove special damages.  *See Chandok*, 632 F.3d at 814; *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61 (2d Cir. 1993).  The doctrine does not undermine a substantial truth defense, and therefore does not save Morgalo's claim.  *Cf. Guccione*, 800 F.2d at 299-300 (finding substantial truth defense in case where statement imputed criminal adultery).

By proving that his statement was substantially true, Blades wields a complete defense to Morgalo's defamation claim under New York law.  Defendants Rubén Blades and Ruben Blades Productions, Inc. are therefore entitled to judgment.

## CONCLUSION

For the foregoing reasons, Morgalo's claim is **DISMISSED ON THE MERITS.** This opinion sets out the court's separate findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1). Final judgment shall be entered.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 16th day of May, 2013.

                                        *S/ Bruce J. McGiverin*
                                        BRUCE J. McGIVERIN
                                        United States Magistrate Judge